## BEFORE THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, 420 Mountain Avenue P.O. Box 6 Murray Hill NJ 07974 | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR NETBANK ALPHARETTA, GA 1601 Bryan Street Dallas TX 75201 | ) ) ) ) ) ) |
| Defendant. | ) ) ) ) |

### COMPLAINT

Hewlett-Packard Financial Services Company ("HPFS" or "Plaintiff"), hereby brings suit against the Federal Deposit Insurance Corporation in its capacity as the receiver (the "Receiver" or "Defendant") for NetBank Alpharetta, GA ("NetBank"), and alleges the following for its complaint:

### Nature of the Case

1.       This suit is brought pursuant to 12 U.S.C. § 1821(d)(6), which expressly authorizes this Court to hear the complaint of any entity or person who has filed a monetary claim with an FDIC receivership but whose claim has been disallowed.

### The Parties

2.       The Plaintiff is a financial services company duly organized and validly existing under the laws of the State of Delaware.

3.      The Defendant is an independent agency of the U.S. Government, which assumed responsibility for the receivership of NetBank.

### Background

4.      Prior to the commencement of NetBank's receivership, HPFS leased certain computer equipment (the "Equipment") to NetBank's parent, NetBank, Inc., currently a Chapter 11 debtor.

5.      Since the commencement of the NetBank receivership, the Receiver has been using the Equipment, including hard drives.

6.      The Receiver has purchased certain hard drives from HPFS and has paid for these hard drives.

7.      The Receiver has also returned to HPFS some, but not all, of the Equipment.

8.      Despite using the Equipment since the commencement of the receivership, the Receiver has not compensated HPFS for such use.

9.      HPFS filed a claim with the Receiver seeking compensation for the Equipment and its use by the Receiver. A copy of HPFS's claim is attached hereto as Exhibit A. The usage charges, equal to the monthly lease payments, were included in HPFS' claim.

10.     On April 15, 2008, the Receiver issued to HPFS a Notice of Disallowance of Claim, which states as grounds for disallowance the following: "Services used, including equipment not returned, are being reimbursed separately. The remainder of your claim is disallowed as not being proven to the satisfaction of the Receiver". A copy of the Notice of Disallowance of Claim is attached hereto as Exhibit B.

11.     By letter dated May 2, 2008, and a follow-up letter dated May 27, 2008, counsel for HPFS sought clarification from the Receiver whether the monthly usage charges due HPFS

are included in the items that are "being reimbursed separately" by the Receiver or whether the Receiver was denying any obligation to pay these charges.

12.    As of the date hereof, the Receiver has failed to confirm to HPFS that the monthly usage charges would be paid and has failed to remit to HPFS any such payment.

13.    The monthly usage charges due and owing to HPFS for the Receiver's use of the Equipment through June 30, 2008 equal $402,242.42.    Attached hereto as Exhibit C is a chart detailing the amounts due and owing HPFS through June 30, 2008 on a contract-by-contract basis.[1]

14.    In addition, as of the date hereof, the Receiver has failed to return to HPFS the Equipment subject to the lease contracts identified in Exhibit D attached hereto.    The quarterly payment for the use of this Equipment is $80,136.89.    To the extent the Receiver fails to return the Equipment to HPFS before the next quarterly payment for the period of July 1 through September 30, 2008 is due on June 30, 2008, the total amount of HPFS's claim against the Receiver will continue to increase.

### Jurisdiction and Venue

15.    This action arises under the laws of the United States including 12 U.S.C. § 1821(d)(6) which is part of the Federal Deposit Insurance Act, as amended.    The legislative history of this section demonstrates that the plaintiff is entitled to a *de novo* review of its claim by the Court rather than a deferential review of FDIC's prior disallowance of the claim.    *See* H.R. Rep. No. 54, 101st Cong., 1st Sess., pt. 1 at 418-419, *reprinted in* U.S.C.C.A.N. 86, at 214-215.

16.    Venue is proper in this Court under 12 U.S.C. § 1821(d)(6).

---

[1] An item-by-item description of the Equipment subject to these leases is too voluminous to attach hereto and will be produced upon request.

## First Cause of Action

17.    Plaintiff repeats and realleges the statements made above in paragraphs 1 through 16 as if fully set forth herein.

18.    The Receiver is obligated to pay all valid claims presented to it if sufficient funds exist in the receivership to do so.

19.    The Receiver has wrongfully declined to return all of the Equipment to Plaintiff and pay the Plaintiff's claim for use of the Equipment.

## Request for Relief

Based on the above described facts and charges, the Plaintiff hereby requests that a judgment be entered against the Defendant as follows:

(a)    Ordering the Defendant to immediately return all of the remaining Equipment to the Plaintiff.

(b)    Ordering the Defendant to pay the Plaintiff $402,242.42 for the Receiver's use of the Equipment plus all additional usage and other applicable charges due through the date of the Defendant's return of the Equipment to the Plaintiff;

(c)    Awarding the Plaintiff attorneys' fees, costs, and expenses related to the preparation and filing of its claim with the Receiver as well as the attorneys' fees, costs, and expenses related to bringing and maintaining this case.

Dated: June 13, 2008

SILLS CUMMIS & GROSS P.C.
Jack M. Zackin, Esq.
One Riverfront Plaza
Newark, NJ 07102
973-643-7000

-and-

MCCARTHY & WHITE PLLC
Kevin McCarthy, Esq., DC Bar #218149
8180 Greensboro Drive, Suite 875
McLean, Virginia 22102
(703) 770-9260
Attorneys for Plaintiff

By:/s/ Kevin R. McCarthy
      Kevin R. McCarthy

# EXHIBIT A

Federal Deposit Insurance Corporation as Receiver for:
10001 – NetBank Alpharetta, GA
(Name of Bank/Financial Institution and Location)

## PROOF OF CLAIM

SSN/Tax ID # (1) _76 - 0523923_

The undersigned, (2) _STEVE KOPITSKIE_
(Name of person making the claim)

says that the **NetBank** _____ now in liquidation is
(Name of Bank/Financial Institution)

justly indebted to (3) **HEWLETT PACKARD FINANCIAL SERVICES CO** _____ in the sum of
(Individual/Joint/Corporation/Partnership/Firm/Agency)

(4) _One Million Four Hundred Nine Thousand Eight Hundred_ Dollars upon the following Claim:
_Sixty-Seven and 15/100_

| Description of (invoice) claim | Liability Number | Amount of Claim |
|---|---|---|
| C (5)<br>L<br>A  SEE ATTACHMENT A<br>I<br>M<br>S | 500000181-000 | $1,409,867.15 |
| | Total Claim (6) | $1,409,867.15 |

The undersigned further states that he/she makes this claim on behalf of

(7) **HEWLETT PACKARD FINANCIAL SERVICES CO** _____ ,

that no part of said debt has been paid, that

(8) **HEWLETT PACKARD FINANCIAL SERVICES CO** _____
(Individual/Joint/Corporation/Partnership/Firm/Agency)

has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or

counterclaim, or other legal or equitable defense to said claim or any part thereof.

NAME (9) _____    _Recovery Manager_
(Signature of Person making the Claim)    (Title)

FIRM _HEWLETT - PACKARD FINANCIAL SERVICES Co_
(if applicable)

ADDRESS (10) _420 MOUNTAIN AVE_

CITY/STATE/ZIP _Murray Hill, NJ  07974_

TELEPHONE NUMBER _908 - 898 - 4616_

The penalty for knowingly making or inviting reliance of any false, forged, or counterfeit statement, document,
or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a
fine of not more than $1,000,000 or imprisonment for not more than thirty years, or both (18 U.S.C. Section
1007).

RLS7212                                                                                          3

A

ATTACHMENT A
to
Proof of Claim
of
Hewlett-Packard Financial Services Company
Re: FDIC as Receiver of NetBank
No. 10001

The obligations of NetBank ("NetBank") to Hewlett-Packard Financial Services Company ("HPFS") arise under various Master Lease and Financing Agreements, Schedules, lease agreements and other agreements between HPFS and NetBank and/or its subsidiaries and affiliates (collectively, the "Agreements") The Agreements are in the possession of NetBank; however, HPFS shall provide these documents upon request.

As of December 31, 2007, the amount of the claim of HPFS with respect to goods leased and/or financed equaled $1,409,867.15. Except as set forth below with respect to fair market value purchase options contained in certain of the Agreements, this represents all sums due and to become due as of such date.

The Agreements contain fair market value purchase options; accordingly, NetBank is required to return the subject equipment or exercise the option to renew or buyout the equipment. The claim of HPFS set forth in this Proof of Claim does not include amounts to be paid by NetBank in the event it exercises the option to purchase or renew the applicable Agreements. HPFS reserves the right to assert these amounts as additional claims.

The claim of HPFS does not include unbilled Personal Property Taxes. HPFS reserves the right to amend this Proof of Claim to include such taxes and any other amounts that are or may become due pursuant to any Agreement with NetBank, or for any other reason.

**Compaq Financial Services**

Master Agreement Number 100736

# COMPAQ

## MASTER LEASE AND FINANCING AGREEMENT

This Master Lease and Financing Agreement (together with Exhibits A through E attached hereto and hereby made a part hereof, this "Master Agreement") dated as of November 4, 1999, is entered into by and between Compaq Financial Services Corporation, a Delaware corporation ("Lessor"), and Resource Bancshares Mortgage Group, Inc., a Delaware corporation ("Lessee"). Capitalized terms used in this Master Agreement without definition have the meanings ascribed to them in Section 31.

**1. PURPOSE OF MASTER AGREEMENT.** The purpose of this Master Agreement is to set forth the general terms and conditions upon which (a) Lessor shall lease to Lessee and Lessee shall lease from Lessor items of Hardware, Software or both (such Hardware and Software being collectively referred to as an "Equipment", and each such lease of Equipment being referred to as a "Lease"), and (b) Lessor shall provide financing to Lessee (each such financing transaction being referred to as a "Financing") for software program license fees, maintenance fees, fees for other services and other one-time charges ("Financed Items") Lessee desires to finance hereunder. In connection with its execution of this Master Agreement, Lessee shall deliver to Lessor an Officer's Certificate in form and substance acceptable to Lessor, executed by a duly authorized officer of Lessee and certifying as to, among other things, Lessee's authority to enter into this Master Agreement and Leases and Financings hereunder and the authority of Lessee's officers or representatives specified therein to execute this Master Agreement and all other Fundamental Agreements.

**2. ALTERNATIVE COMMENCEMENT PROCEDURES.** Subject to the other terms and conditions contained in this Master Agreement and the applicable Schedule or Advance Pricing Agreement, Lessee may, at its option, enter into individual Leases and Financings with Lessor under either or both of the following procedures:

A. TRADITIONAL PROCEDURE. (a) Execution of Schedule. Lessor and Lessee mutually agree to enter into a Lease, a Financing or both by executing a Schedule in the form of Exhibit A with such changes as Lessor and Lessee shall have agreed to as conclusively evidenced by their execution thereof. Each such Schedule shall specifically identify (by serial number or other identifying characteristics) the items of Equipment to be leased under such Schedule (other than items of System Software, which shall be deemed to be items of Software leased under the Schedule pursuant to which the related items of Hardware are leased), and the Financed Items to be financed under such Schedule. Each Schedule, when executed by both Lessee and Lessor, together with this Master Agreement, shall constitute a separate and distinct Lease, a separate and distinct Financing, or a separate and distinct Lease and a separate and distinct Financing, as the case may be, enforceable according to its terms. In the event of any conflict between the terms of this Master Agreement and such Schedule, the provisions of the Schedule shall govern.

(b) Acceptance; Initial Term of Leases and Term of Financings. Lessee shall accept the Equipment subject to a Lease and the Financed Items subject to a Financing in accordance with Section 3. The Initial Term of each Lease and, if applicable, the Term of any related Financing evidenced by a Schedule executed pursuant to this Section 2.A shall begin on the Acceptance Date of the Equipment subject to such Lease and shall continue for the period described in the applicable Schedule. The Term of each Financing evidenced by a Schedule executed pursuant to this Section 2.A that is unrelated to any Lease shall begin on the Acceptance Date for the related Financed Items and shall continue for the period described in the applicable Schedule.

(c) Adjustments to Schedule. Lessee acknowledges that the Total Cost of Equipment and Financed Items and the related Rent payments set forth in any Schedule executed pursuant to this Section 2.A may be estimates, and if the final invoice from the Seller specifies a Total Cost that is more or less than the estimated Total Cost set forth in the Schedule, Lessee hereby authorizes Lessor to adjust the applicable Total Cost and Rent payment on the Schedule to reflect the final invoice amount (the "Final Invoice Amount"). However, if the Final Invoice Amount exceeds the estimated Total Cost by more than 5%, Lessor will notify Lessee and obtain Lessee's prior written approval of the adjustments. If Lessee fails to so approve any such adjustments within 15 days of Lessor's request, then the affected Schedule shall terminate without penalty to

either Lessor or Lessee and Lessee shall be solely responsible for all obligations arising under the applicable Purchase Documents, including, without limitation, the obligation to purchase Equipment and pay Financed Items. All references in this Master Agreement and any Schedule to Total Cost and Rent shall mean the amounts thereof specified in the applicable Schedule, as adjusted pursuant to this paragraph. Lessee also acknowledges that the Equipment and Financed Items described in a Schedule may differ from the description of the Equipment and Financed Items set forth in the related Acceptance Certificate and actually accepted by Lessee. Lessee hereby authorizes Lessor to conform the description of the Equipment and Financed Items set forth in any Schedule to the description thereof in the related Acceptance Certificate. All references in this Master Agreement and any Schedule to the Equipment subject to a Lease and the Financed Items subject to a Financing shall mean the Equipment and Financed Items described in the applicable Schedule, as conformed to the related Acceptance Certificate pursuant to this paragraph.

B. FUNDING CONSOLIDATION PROCEDURE. (a) Execution of Advance Pricing Agreement. Lessor and Lessee mutually agree to enter into one or more Leases, Financings or both by executing, from time to time, an Advance Pricing Agreement in the form of Exhibit B with such changes as Lessor and Lessee shall have agreed to as conclusively evidenced by their execution thereof. Subject to the following provisions of this Section 2.B, such Advance Pricing Agreement shall constitute a commitment on the part of Lessor, during the Commitment Period specified therein (i) to purchase Equipment of the type(s) described therein and enter into one or more Leases of the same with Lessee at the lease rates set forth therein, and (ii) to fund Financed Items of the type(s) described therein and enter into one or more Financings of the same with Lessee at the financing rates set forth therein; provided, however, that Lessor shall under no circumstances be obligated to purchase Equipment or fund Financed Items if (x) such purchase or funding would require Lessor to expend moneys in excess of the Amount Available specified in the Advance Pricing Agreement less the aggregate amount previously paid or committed to be paid by Lessor to acquire Equipment or fund Financed Items during such Commitment Period, or (y) any Lessee Default shall have occurred and be continuing under any Lease or Financing or any event shall have occurred and be continuing which, with the giving of notice or the passage of time or both, would constitute a Lessee Default under any Lease or Financing or (z) Lessee shall have failed to deliver to Lessor any financial statements in accordance with the provisions of paragraph (f) below or any material adverse change shall have occurred in Lessee's financial or operating condition, as determined by Lessor in its sole discretion, after the date of the last financial statements of Lessee delivered to Lessor prior to the execution and delivery of such Advance Pricing Agreement.

(b) Lessor's Purchase of Equipment and Funding of Financed Items. Subject to the provisions of this Section 2.B and the applicable Advance Pricing Agreement, Lessor shall, at Lessee's request made during the Commitment Period specified in such Advance Pricing Agreement (i) purchase Equipment of the type(s) described therein and enter into a Lease of such Equipment with Lessee, and (ii) fund Financed Items of the type(s) described therein and enter into a Financing with Lessee relating to such Financed Items. Until such time as Lessee shall have executed and delivered to Lessor a Consolidating Schedule in accordance with paragraph (d) below, each such Lease or Financing shall be governed by the terms of this Master Agreement, the applicable Advance Pricing Agreement and the Acceptance Certificate executed and delivered to Lessor by Lessee pursuant to paragraph (c) below. Each such Acceptance Certificate shall specifically identify (by serial number or other identifying characteristics) the items of Equipment to be leased thereunder (other than items of System Software, which shall be deemed to be items of Software leased together with the related items of Hardware) and the Financed Items to be financed thereunder. Until Lessee shall have executed and delivered to Lessor a Consolidating Schedule, each such Acceptance Certificate, when executed and delivered by Lessee and accepted by Lessor, together with this Master Agreement and the applicable Advance Pricing Agreement, shall constitute a separate and distinct Lease, a separate and distinct Financing, or a separate and distinct Lease and a separate and distinct Financing, as the case may be, enforceable according to its terms. In the event of any conflict among the terms of such documents, the provisions of such Acceptance Certificate shall control over conflicting provisions in such Advance Pricing Agreement or this Master Agreement and the provisions of such Advance Pricing Agreement shall control over conflicting provisions in this Master Agreement.

(c) Acceptance; Initial Term of Leases and Term of Financings. Lessee shall accept the Equipment subject to a Lease and the Financed Items subject to a Financing in accordance with Section 3. The Initial Term of each Lease and, if applicable, the Term of any related Financing evidenced by an Advance Pricing Agreement and an Acceptance Certificate shall begin on the Acceptance

8/99 Rev
1

Date of the Equipment subject to such Lease and shall continue for the period determined pursuant to such Advance Pricing Agreement. The Term of each Financing evidenced by an Advance Pricing Agreement and an Acceptance Certificate that is unrelated to any Lease shall begin on the Acceptance Date for the related Financed Items and shall continue for the period determined pursuant to such Advance Pricing Agreement.

(d) Periodic Consolidation of Leases and Financings. All Leases and Financings commenced during a Consolidation Period (as specified in the applicable Advance Pricing Agreement) pursuant to this Section 2.B shall be consolidated into a single Schedule (a "Consolidating Schedule") in the form of Exhibit C with such changes as Lessor and Lessee shall have agreed to as conclusively evidenced by their execution thereof. Lessor shall prepare and deliver to Lessee a Consolidating Schedule as of the close of each applicable Consolidation Period. Lessee agrees to execute and deliver each Consolidating Schedule to Lessor within 10 business days after its receipt thereof from Lessor. From and after Lessee's execution and delivery to Lessor of a Consolidating Schedule, the Consolidating Schedule shall supersede the applicable Advance Pricing Certificates and the Advance Pricing Agreement with respect to all Leases and Financings commenced during the Consolidation Period to which such Consolidating Schedule relates, and all such Leases shall be deemed to be a single, separate and distinct Lease and all such Financings shall be deemed to be a single, separate and distinct Financing, in each case governed by such Consolidating Schedule and this Master Agreement and enforceable in accordance with its terms. In the event of any conflict between the terms of this Master Agreement and such Consolidating Schedule, the provisions of the Consolidating Schedule shall govern.

(e) Failure of Lessee to Deliver Consolidating Schedule. If Lessee fails to execute and deliver to Lessor any Consolidating Schedule within 10 business days after its receipt thereof, Lessor may exercise its rights and remedies under Section 21 and 22 of this Master Agreement arising as a result of such failure, either immediately or at any time during the Initial Term of the Leases or the Term of the Financings to which such Consolidating Schedule relates. No delay in exercising such rights or remedies shall operate as a waiver thereof. Lessee acknowledges and agrees that Rent with respect to such Leases and Financings shall be payable in the amounts and at the times determined pursuant to the applicable Advance Pricing Agreement and Acceptance Certificates, regardless of whether Lessee shall have received such Consolidating Schedule from Lessor or executed and delivered the same to Lessor as of the time any such payment is due.

(f) Financial Statements. Upon Lessor's request, Lessee shall, at all times during which any Advance Pricing Agreement is effective, deliver to Lessor its quarterly and annual financial statements no later than 45 days after the end of each of Lessee's fiscal quarters or 90 days after the end of each of Lessee's fiscal years, as applicable. Such annual financial statements shall be audited and certified by Lessee's independent certified public accountants.

## 3. ACCEPTANCE OF EQUIPMENT AND FINANCED ITEMS.
(a) General. Lessee shall unconditionally and irrevocably accept all Equipment under a Lease and, if applicable, all related Financed Items subject to a Financing as soon as such Equipment is delivered and inspected by Lessee or, if acceptance requirements for such Equipment, related Financed Items or both are specified in the applicable Purchase Documents, as soon as such requirements are met. Lessee shall evidence such acceptance by executing and delivering to Lessor a properly completed Acceptance Certificate in substantially the form of (i) Exhibit D if the Lease or the Lease and the related Financing, as the case may be, is evidenced by a Schedule executed pursuant to Section 2.A, or (ii) Exhibit E if the Lease or the Lease and the related Financing, as the case may be, is being commenced pursuant to an Advance Pricing Agreement executed pursuant to Section 2.B. Lessee agrees (y) to inspect all Equipment as soon as reasonably practicable after the delivery thereof to Lessee or, if acceptance requirements for such Equipment or any related Financed Items are specified in the applicable Purchase Documents, as soon as reasonably practicable after being advised by the Supplier that such requirements have been met, and (z) to complete, execute and deliver to Lessor such Acceptance Certificate as soon as reasonably practicable after its satisfactory completion of such inspection. In the case of a Financing of Financed Items unrelated to any Equipment subject to a Lease, Lessee shall unconditionally and irrevocably accept such Financed Items as soon as it shall have become liable to pay for such Financed Items, and shall complete, execute and deliver to Lessor an Acceptance Certificate in substantially the form of Exhibit D or Exhibit E (as applicable) as soon as reasonably practicable thereafter.

(b) E-mail Acceptance. For its convenience and at its option, Lessee may accept Equipment and Financed Items by electronic mail in accordance with this paragraph, in lieu of the execution and physical delivery of Acceptance Certificates provided for in paragraph (a) above. Subject to the terms and conditions set forth below, a Valid E-mail Acceptance Certificate shall constitute an original and authentic written Acceptance Certificate, duly

executed and delivered by an authorized representative of Lessee. A "Valid E-mail Acceptance Certificate" means an electronic facsimile of an Acceptance Certificate in substantially the form of Exhibit D or Exhibit E (as applicable) properly completed and sent by an Authorized Lessee Representative from his or her Authorized Lessee E-mail Address to an Authorized Lessor E-mail Address by an electronic mail message confirming Lessee's acceptance of the Equipment or Financed Items described therein. Upon request, Lessor shall provide to Lessee electronic file copies of Exhibits D and E for Lessee's use under this paragraph. The Authorized Lessee Representatives and their corresponding Authorized Lessee E-mail Addresses and the Lessee Acceptance Confirmation Fax Numbers are as specified in Section 29 or as designated by Lessee in a written notice executed by a duly authorized officer of Lessee and delivered to Lessee in accordance with Section 29. The Authorized Lessor E-mail Address(es) are specified in Section 29. Lessee may unilaterally modify any of the Authorized Lessee Representatives and Authorized Lessee E-mail Addresses and the Lessee Acceptance Confirmation Fax Number by a duly authorized officer of Lessee and notice of the modification executed by a duly authorized officer of Lessee and delivered to Lessor in accordance with Section 29. Lessor may unilaterally modify any Authorized Lessor E-mail Address by written notice of the modification executed by a duly authorized officer of Lessor and delivered to Lessee in accordance with Section 29. Upon Lessor's receipt of a Valid E-mail Acceptance Certificate from Lessee, Lessor shall transmit to Lessee by confirmed facsimile transmission to the Lessee Acceptance Confirmation Fax Number, a notice acknowledging Lessor's receipt of the Valid E-mail Acceptance Certificate from Lessee. A Valid E-mail Acceptance Certificate shall become effective and constitute Lessee's unconditional and irrevocable acceptance of the Equipment or Financed Items described therein, as of the Acceptance Date specified therein, at the end of the second business day following the day on which Lessor shall have transmitted such notice unless Lessee shall have delivered a written notice to Lessor in accordance with Section 29 revoking such Valid E-mail Acceptance Certificate prior to the end of such second business day. Lessor's transmission of such notice shall constitute Lessor's acknowledgement and acceptance of the Valid E-mail Acceptance Certificate. Lessee expressly waives any claim or defense that any Valid E-mail Acceptance Certificate which was sent and became effective in accordance with the above procedures does not constitute an original and authentic written Acceptance Certificate, duly executed and delivered by Lessee.

## 4. LESSEE'S END-OF-LEASE-TERM OPTIONS; AUTOMATIC EXTENSION.
Lessee shall have the following options in respect of each Lease at the end of each of the Initial Term, any Renewal Term and any optional extension of the Initial Term or any Renewal Term:

A. Purchase Option. Lessee may elect, by delivering to Lessor an End-of-Term Notice at least 90 days prior to the expiration of the Initial Term, any Renewal Term or any optional extension of the Initial Term or any Renewal Term, to purchase any or all Units of Equipment then subject to such Lease (other than items of Software that may not be sold by Lessor under the terms of any applicable License Agreement) for an amount equal to the Fair Market Value of such Units of Equipment as of the end of the Then Applicable Term, provided no Lessor Default shall have occurred and be continuing. In the event of such an election, Lessee shall pay such amount to Lessor, in immediately available funds, on or before the last day of the Then Applicable Term. If Lessee shall have so elected to purchase any of the Units of Equipment, shall have so paid the applicable purchase price and shall have fulfilled the terms and conditions of this Master Agreement, then on the last day of the Then Applicable Term (i) the Lease with respect to such Units of Equipment shall terminate and, except as provided in Section 27, Lessee shall be relieved of all of its obligations in favor of Lessor with respect to such Units of Equipment, and (ii) Lessor shall transfer all of its interest in such Units of Equipment to Lessee "AS IS, WHERE IS," without any warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor. In the event Lessor and Lessee are unable to agree on the Fair Market Value of any Units of Equipment, Lessor shall, at Lessee's expense, select an independent appraiser to conclusively determine such amount.

B. Renewal Option. Lessee may elect, by delivering to Lessor an End-of-Term Notice at least 90 days prior to the expiration of the Initial Term, any Renewal Term, or any optional extension of the Initial Term or any Renewal Term, to renew the Lease with respect to any or all Units of Equipment then subject to such Lease (other than items of Software that may not be re-released by Lessor under the terms of any applicable License Agreement) for an amount equal to the Fair Rental Value of such Units of Equipment as of the end of the Then Applicable Term. In the event of such an election, Lessee shall enter into a mutually agreeable renewal agreement with Lessor ("Renewal Agreement") on or before the last day of the Then Applicable Term confirming the Units of Equipment as to which the Lease is to be renewed, the period for which the Lease is to be renewed (the "Renewal Term"), and the amount of Rent and the times at which such Rent is to be payable during the Renewal Term. In the

$99 Rev

2

event Lessor and Lessee are unable to agree on the Fair Rental Value of any Units of Equipment, Lessor shall, at Lessee's expense, select an independent appraiser to conclusively determine such amount.

C. Return. Lessee may elect, by delivering to Lessor an End-of-Term Notice at least 90 days prior to the expiration of the Initial Term, any Renewal Term or any optional extension of the Initial Term or any Renewal Term, to return any or all of the Units of Equipment then subject to such Lease in accordance with Section 9 of this Master Agreement.

D. Optional Extension. Lessee may elect, by omitting to deliver to Lessor an End-of-Term Notice at least 90 days prior to the expiration of the Initial Term or any Renewal Term, to extend the Initial Term or such Renewal Term, as the case may be, in that event, the Initial Term or such Renewal Term shall, without any additional notice or documentation, be automatically extended for successive calendar months with respect to all items of Equipment then subject to such Lease through the end of the calendar month falling at least 90 days after the date Lessee shall have delivered to Lessor an End-of-Term Notice with respect to such Lease. For each calendar month that the Then Applicable Term of such Lease is so extended, Lessee shall pay to Lessor Rent in an amount equal to the monthly Rent payment in effect immediately prior to such extension (or the appropriate pro rata portion of the Rent payment then in effect in the case of Rent payable other than on a monthly basis) and all other provisions of this Master Agreement and the applicable Schedule shall continue to apply.

If Lessee shall have delivered to Lessor an End-of-Term Notice with respect to a Lease, but shall have subsequently failed to comply with its obligations arising from its elections specified therein (e.g. Lessee shall have failed, on or before the last day of the Then Applicable Term (i) to pay Lessor the purchase price for Equipment to be purchased in accordance with Section 4.A above (ii) to execute a Renewal Agreement with respect to Equipment as to which the Lease is to be renewed in accordance with Section 4.B above, or (iii) to return to Lessor Equipment to be returned in accordance with Section 4.C above), then the Then Applicable Term of such Lease shall, without any additional notice or documentation, be automatically extended for successive calendar months with respect to all items of Equipment as to which Lessee shall have so failed to comply with its obligations through the end of the calendar month in which Lessee shall have complied with such obligations. For each calendar month that the Then Applicable Term of any Lease is so extended, Lessee shall pay to Lessor Rent in an amount equal to the monthly Rent payment in effect immediately prior to such extension (or the appropriate pro rata portion of the Rent payment then in effect in the case of Rent payable other than on a monthly basis) and all other provisions of this Master Agreement and the applicable Schedule shall continue to apply. Notwithstanding any of the provisions of this Section 4 to the contrary, if any Lessee Default shall have occurred and be continuing at any time during the last 90 days of the Then Applicable Term of any Lease, Lessor may cancel any Renewal Term or optional or other automatic extension of the Then Applicable Term immediately upon written notice to Lessee.

**5.  RENT; LATE CHARGES; ADVANCE RENT.** As rent ("Rent") for the Equipment under any Lease and the Financed Items under any Financing, Lessee agrees to pay the amounts specified in the applicable Schedule on the due dates specified in the applicable Schedule. Lessee agrees to pay Lessor interest on any Rent payment or other amount due hereunder that is not paid within 10 days of its due date, at the rate of 1-1/2% per month (or such lesser rate as is the maximum rate allowable under applicable law). Lessee shall pay to Lessor, with respect to each Lease or Financing, the Advance Rent specified on the applicable Schedule, if any.  Any payment of Advance Rent shall be credited against the first Rent payment payable by Lessee under the applicable Schedule and any excess Advance Rent will be credited against the last Rent payment(s) payable by Lessee with respect to the Initial Term of the applicable Lease or Financing. Advance Rent shall be refunded to Lessee without interest only if Lessor declines to sign the applicable Schedule.

**6.  LEASES AND FINANCINGS NON-CANCELABLE; NET LEASES; WAIVER OF DEFENSES TO PAYMENT.  IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT EACH LEASE AND FINANCING HEREUNDER SHALL BE NON-CANCELABLE, AND THAT EACH LEASE HEREUNDER IS A NET LEASE. LESSEE AGREES THAT IT HAS AN ABSOLUTE AND UNCONDITIONAL OBLIGATION TO PAY ALL RENT AND OTHER AMOUNTS WHEN DUE. LESSEE IS NOT ENTITLED TO ABATE OR REDUCE RENT OR ANY OTHER AMOUNT DUE, OR TO SET OFF ANY CHARGE AGAINST ANY SUCH AMOUNT. LESSEE HEREBY WAIVES ANY RECOUPMENT, CROSS-CLAIM, COUNTERCLAIM OR ANY OTHER DEFENSE AT LAW OR IN EQUITY TO ANY RENT PAYMENT OR OTHER AMOUNT DUE WITH RESPECT TO ANY LEASE OR FINANCING, WHETHER ANY SUCH DEFENSE ARISES OUT OF THIS MASTER AGREEMENT, ANY**

SCHEDULE, ANY CLAIM BY LESSEE AGAINST LESSOR, LESSOR'S ASSIGNEES OR SUPPLIER, OR OTHERWISE.  IF THE EQUIPMENT OR ANY FINANCED ITEM IS NOT PROPERLY INSTALLED, DOES NOT OPERATE OR INTEGRATE AS REPRESENTED OR WARRANTED BY SUPPLIER OR IS UNSATISFACTORY FOR ANY REASON WHATSOEVER, LESSEE SHALL MAKE ANY CLAIM ON ACCOUNT THEREOF SOLELY AGAINST SUPPLIER AND SHALL NEVERTHELESS PAY ALL SUMS DUE WITH RESPECT TO EACH LEASE AND EACH FINANCING.

**7.  ASSIGNMENT OF PURCHASE DOCUMENTS.** Lessee assigns to Lessor all of Lessee's right, title and interest in and to (a) the Equipment described in each Schedule, and (b) the Purchase Documents relating to such Equipment. Such assignment of the Purchase Documents is an assignment of rights only; nothing in this Master Agreement shall be deemed to have relieved Lessee of any obligation or liability under any of the Purchase Documents, except that, as between Lessee and Lessor, Lessor shall pay for the Equipment within 30 days after Lessee's delivery to Lessor of a properly completed and executed Acceptance Certificate and all other documentation necessary to establish Lessee's acceptance of such Equipment under the related Lease. Lessee represents and warrants that it has reviewed and approved the Purchase Documents.  In addition, if Lessor shall so request, Lessee shall deliver to Lessor a document acceptable to Lessor whereby Seller acknowledges and provides any required consent to such assignment. For the avoidance of doubt, Lessee covenants and agrees that it shall at all times during the Total Term of each Lease comply in all respects with the terms of any License Agreement relating to any Equipment leased thereunder.  IT IS ALSO SPECIFICALLY UNDERSTOOD AND AGREED THAT NEITHER SUPPLIER NOR ANY SALESPERSON OF SUPPLIER IS AN AGENT OF LESSOR, NOR ARE THEY AUTHORIZED TO WAIVE OR ALTER ANY TERMS OF THIS MASTER AGREEMENT OR ANY SCHEDULE.

**8.  ASSIGNMENT OF SUPPLIER WARRANTIES.** To the extent permitted, Lessor hereby assigns to Lessee, for the Total Term of any Lease, all Equipment warranties provided by any Supplier in the applicable Purchase Documents. Lessee shall have the right to take any action it deems appropriate to enforce such warranties provided such enforcement is pursued in Lessee's name and at its expense.  In the event Lessee is precluded from enforcing any such warranty in its name, Lessor shall, upon Lessee's request, take reasonable steps to enforce such warranty.  In such circumstances, Lessee shall, promptly upon demand, reimburse Lessor for all out-of-pocket expenses incurred by Lessor in enforcing the Supplier warranty.  Any recovery resulting from any such enforcement efforts shall be divided among Lessor and Lessee as their interests may appear.

**9.  EQUIPMENT RETURN REQUIREMENTS.** On or before the last day of the Total Term of each Lease (and any other time Lessee is required to return Equipment to Lessor under the terms of this Master Agreement or any Schedule), Lessee shall pack the Equipment to be returned to Lessor in accordance with the manufacturer's guidelines and deliver such Equipment to Lessee at any destination within the continental United States designated by Lessor.  In the case of any item of Software to be returned to Lessee, Lessee shall also deliver to Lessor the original Certificate of Authenticity issued by the licensor of such Software, if any. Alternatively, Lessee may deliver any such Certificate of Authenticity to Lessor on or at any time after the Acceptance Date for such Software.  All dismantling, packaging, transportation, in-transit insurance and shipping charges shall be borne by Lessee. All Equipment shall be returned to Lessor in the same condition and working order as when delivered to Lessee, reasonable wear and tear excepted, and shall qualify for maintenance service by the Supplier at its then standard rates for Equipment of that age, if available. Lessee shall be responsible for, and shall reimburse Lessor promptly on demand for, any cost incurred by Lessor to qualify the Equipment for the Supplier's maintenance service or, if not available, to return the Equipment to good working condition.

**10.  EQUIPMENT USE AND MAINTENANCE.** Lessee is solely responsible for the selection, installation, operation and maintenance of the Equipment and all costs related thereto, including shipping charges. Lessee shall at all times operate and maintain the Equipment in good working order, repair, condition and appearance, and in accordance with the manufacturer's specifications and recommendations. On reasonable prior notice to Lessee, Lessor and Lessor's agents shall have the right, during Lessee's normal business hours, to enter the premises where the Equipment is located for the purpose of inspecting the Equipment and observing its use. If Lessor shall have provided to Lessee any tags or identifying labels, Lessee shall, at its expense, affix and maintain in a prominent position on each item of Equipment such tags or labels to indicate Lessor's ownership of the Equipment. Except in the case of PC Equipment and Software, Lessee shall, at its expense, enter into and maintain

and enforce at all times during the Total Term of each Lease a maintenance agreement to service and maintain the related Equipment, upon terms and with a provider reasonably acceptable to Lessor.

11. **EQUIPMENT OWNERSHIP; LIENS; LOCATION.** As between Lessor and Lessee, Lessor is the sole owner of the Equipment and has sole title thereto. Lessee shall not make any representation to any third-party inconsistent with Lessor's sole ownership of the Equipment. Lessee covenants that it will not pledge or encumber the Equipment or Lessor's interest in the Equipment in any manner whatsoever nor create or permit to exist any levy, lien or encumbrance thereof or thereon except those created by or through Lessor. The Equipment shall remain Lessor's personal property whether or not affixed to realty and shall not become a fixture or be made to become a part of any real property on which it is placed without Lessor's prior written consent. Lessee shall maintain the Equipment so that it may be removed from any building in which it is placed without any damage to the building or the Equipment. Lessee may relocate any Equipment from the Equipment Location specified in the applicable Schedule to another of its business locations within the United States upon prior written notice to Lessor specifying the new Equipment Location, provided Lessee remains in possession and control of the Equipment.

12. **ALTERATIONS AND ADDITIONS TO EQUIPMENT.** Lessee shall make no alterations or additions to the Equipment, except those that (a) will not void any warranty made by the Supplier of the Equipment, result in the creation of any security interest, lien or encumbrance on the Equipment or impair the value or use of the Equipment either at the time made or at the end of the Total Term of the applicable Lease, and that are readily removable without damage to the Equipment ("Optional Additions"), or (b) are required by any applicable law, regulation or order. All additions to the Equipment or repairs made to the Equipment, except Optional Additions, become a part thereof and Lessor's property at the time made. Optional Additions which have not been removed prior to the return of the Equipment shall become Lessor's property upon such return.

13. **INSURANCE.** Lessee agrees to keep the Equipment insured at Lessee's expense against all risks of loss from any cause whatsoever, including without limitation, theft and damage. Lessee agrees that such insurance shall name Lessor as a loss payee and cover not less than the Stipulated Loss Value of the Equipment. Lessee also agrees that it shall carry commercial general liability insurance in an amount not less than $2,000,000 total liability per occurrence and cause Lessor and its affiliates to be named additional insureds under such insurance. Each policy shall provide that the insurance cannot be canceled without at least 30 days prior written notice to Lessor. Lessee shall provide to Lessor (a) on or prior to the Acceptance Date for each Lease, and from time to time thereafter, certificates of insurance evidencing such insurance coverage throughout the Total Term of each Lease, and (b) upon Lessor's request, copies of the insurance policies. If Lessee fails to provide Lessor with such evidence, then Lessor will have the right, but not the obligation, to purchase such insurance protecting Lessor at Lessee's expense. Lessee's expense shall include the full premium paid for such insurance and any customary charges, costs or fees of Lessor. Lessee agrees to pay such amounts in substantially equal installments allocated to each Rent payment (plus interest on such amounts at the rate of 1-1/2% per month or such lesser rate as is the maximum rate allowable under applicable law).

14. **RISK OF LOSS.** In the event any Casualty Loss shall occur, on the next Rent payment date Lessee shall, at its option (a) pay Lessor the Stipulated Loss Value of the Equipment suffering the Casualty Loss, or (b) substitute and replace each item of Equipment suffering the Casualty Loss with an item of Substitute Equipment. If Lessee shall elect to pay the Stipulated Loss Value of the Equipment suffering a Casualty Loss, upon Lessor's receipt in full of such payment the applicable Lease shall terminate as it relates to such Equipment and, except as provided in Section 27, Lessee shall be relieved of all obligations under the applicable Lease as it relates to such Equipment. If Lessee shall elect to replace Equipment suffering a Casualty Loss with items of Substitute Equipment (i) the applicable Lease shall continue in full force and effect without any abatement of Rent with such Substitute Equipment thereafter being deemed to be Equipment leased thereunder, and (ii) Lessee shall deliver to Lessor a bill of sale or other documentation, in either case in form and substance satisfactory to Lessor, in which Lessee shall represent and warrant that it has transferred to Lessor good and marketable title to all Substitute Equipment, free and clear of all liens, encumbrances and claims of others. Upon Lessor's receipt of such payment of Stipulated Loss Value in full, or such bill of sale or other documentation, as the case may be, Lessee shall transfer to Lessee all of Lessor's interest in the Equipment suffering the Casualty Loss "AS IS, WHERE IS," without any warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor. In the event of any repairable damage

to any Equipment, the Lease shall continue with respect to such Equipment without any abatement of Rent and Lessee shall at its expense promptly cause such Equipment to be repaired to the condition it is required to be maintained in pursuant to Section 10. Lessee shall notify Lessor of any Casualty Loss or repairable damage to any Equipment as soon as reasonably practicable after the date of any such occurrence.

15. **TAXES.** Lessee shall report and pay all Taxes now or hereafter imposed or assessed by governmental body, agency or taxing authority upon the purchase, ownership, delivery, installation, leasing, rental, use or sale of the Equipment, the Rent or other charges payable hereunder, or otherwise upon or in connection with any Lease or Financing, whether assessed on Lessor or Lessee, other than any such Taxes required by law to be reported and paid by Lessee. Lessee shall promptly reimburse Lessor for all such Taxes paid by Lessor, together with any penalties or interest in connection therewith attributable to Lessee's acts or failure to act, excluding (a) Taxes on or measured by the overall gross or net income or items of tax preference of Lessor, (b) as to any Lease or the related Equipment, Taxes attributable to the period after the return of such Equipment to Lessor, and (c) Taxes imposed as a result of a sale or other transfer by Lessor of any portion of its interest in any Lease or Financing or in any Equipment except for a sale or other transfer to Lessee or a sale or other transfer occurring after and during the continuance of any Lessee Default.

16. **GENERAL INDEMNITY.** Lessee shall indemnify and hold harmless Lessor, its employees, officers, directors, agents and assignees and, if requested by Lessor, defend Lessor, its employees, officers, directors, agents and assignees, from and against any and all Claims arising directly or indirectly out of or in connection with any matter involving this Master Agreement, the Equipment or any Lease or Financing including but not limited to (a) the selection, manufacture, purchase, acceptance, rejection, ownership, delivery, lease, financing, possession, maintenance, use, condition, return or operation of any Equipment or Financed Items or the enforcement of Lessor's rights under any Lease or Financing; (b) any latent defect or other defect in any Equipment or Financed Item, whether or not discoverable by Lessor or by Lessee; (c) any patent, trademark or copyright infringement involving any Equipment or Financed Item; (d) the condition of any Equipment or Financed Item arising or existing at any time during the Total Term of any Lease or the Term of any Financing; and (e) any breach by Lessee of any representation, warranty or covenant contained in any Fundamental Agreement. Notwithstanding the foregoing, Lessee shall have no obligation to indemnify or defend against any Claim arising solely as a result of a Lessor Default, or Lessor's gross negligence or willful misconduct.

17. **TAX BENEFIT INDEMNITY.** Each Lease is entered into on the assumption that Lessor is the owner of the Equipment for tax purposes and is entitled to certain federal and state tax benefits available to an owner of Equipment (collectively, "Tax Benefits"), including without limitation, accelerated cost recovery system deductions for 5-year property and deductions for interest incurred by Lessor to finance the purchase of Equipment available under the Code. Lessee represents, warrants and covenants to Lessor that (a) Lessee is not a tax-exempt entity (as defined in Section 168(h) of the Code), (b) all Equipment will be used solely within the United States, and (c) Lessee will take no position inconsistent with the assumption that Lessor is the owner of the Equipment for federal and state tax purposes. If, due to any act or omission of Lessee or any party acting through Lessee, or the breach or inaccuracy of any representation, warranty or covenant of Lessee contained in any Fundamental Agreement, Lessor reasonably determines that it cannot claim, is not allowed to claim, loses or must recapture any or all of the Tax Benefits otherwise available with respect to the Equipment subject to any Lease (a "Tax Loss"), then Lessee shall, promptly upon demand, pay to Lessor an amount sufficient to provide Lessor the same after-tax rate of return and aggregate after-tax cash flow through the end of the Then Applicable Term of such Lease that Lessor would have realized but for such Tax Loss.

18. **COVENANT OF QUIET ENJOYMENT.** So long as no Lessee Default exists, and no event shall have occurred and be continuing which, with the giving of notice or the passage of time or both, would constitute a Lessee Default, neither Lessor nor any party acting or claiming through Lessor, by assignment or otherwise, will disturb Lessee's quiet enjoyment of the Equipment during the Total Term of the related Lease.

19. **DISCLAIMERS AND LESSEE WAIVERS. LESSEE LEASES THE EQUIPMENT FROM LESSOR "AS IS, WHERE IS". IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT (A) EXCEPT AS EXPRESSLY SET FORTH IN SECTION 18, LESSOR MAKES ABSOLUTELY NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING WITHOUT**

8/99 Rev

4

LIMITATION. ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY, OPERATION, OR CONDITION OF ANY EQUIPMENT OR FINANCED ITEMS (OR ANY PART THEREOF), THE MERCHANTABILITY OR FITNESS OF EQUIPMENT OR FINANCED ITEMS FOR A PARTICULAR PURPOSE, OR ISSUES REGARDING PATENT INFRINGEMENT, TITLE AND THE LIKE; (B) LESSOR SHALL NOT BE DEEMED TO HAVE MADE, BE BOUND BY OR LIABLE FOR, ANY REPRESENTATION, WARRANTY OR PROMISE MADE BY THE SUPPLIER OF ANY EQUIPMENT OR FINANCED ITEMS (EVEN IF LESSOR IS AFFILIATED WITH SUCH SUPPLIER); (C) LESSOR SHALL NOT BE LIABLE FOR ANY FAILURE OF ANY EQUIPMENT OR FINANCED ITEMS OR ANY DELAY IN THE DELIVERY OR INSTALLATION THEREOF; (D) LESSEE HAS SELECTED ALL EQUIPMENT AND FINANCED ITEMS WITHOUT LESSOR'S ASSISTANCE; AND (E) LESSOR IS NOT A MANUFACTURER OF ANY EQUIPMENT. IT IS FURTHER AGREED THAT LESSOR SHALL HAVE NO LIABILITY TO LESSEE, LESSEE'S CUSTOMERS, OR ANY THIRD PARTIES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS MASTER AGREEMENT OR ANY SCHEDULE OR CONCERNING ANY EQUIPMENT OR FINANCED ITEMS, OR FOR ANY DAMAGES BASED ON STRICT OR ABSOLUTE TORT LIABILITY OR, EXCEPT TO THE EXTENT CONSTITUTING A LESSOR DEFAULT, LESSOR'S NEGLIGENCE; PROVIDED, HOWEVER, THAT NOTHING IN THIS MASTER AGREEMENT SHALL DEPRIVE LESSEE OF ANY RIGHTS IT MAY HAVE AGAINST ANY PERSON OTHER THAN LESSOR. LESSOR AND LESSEE AGREE THAT THE LEASES AND THE FINANCINGS SHALL BE GOVERNED BY THE EXPRESS PROVISIONS OF THIS MASTER AGREEMENT AND THE OTHER FUNDAMENTAL AGREEMENTS AND NOT BY THE CONFLICTING PROVISIONS OF ANY OTHERWISE APPLICABLE LAW. ACCORDINGLY, TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES ANY RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY ARTICLE 2A OF THE UCC (INCLUDING, BUT NOT LIMITED TO, LESSEE'S RIGHTS, CLAIMS AND DEFENSES UNDER UCC SECTIONS 2A-303 AND 2A-508 THROUGH 2A-522) AND THOSE RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE, IN EITHER CASE THAT ARE INCONSISTENT WITH OR THAT WOULD LIMIT OR MODIFY LESSOR'S RIGHTS SET FORTH IN THIS MASTER AGREEMENT.

**20. LESSEE WARRANTIES.** Lessee represents, warrants and covenants that Lessor that: (a) ALL EQUIPMENT WILL BE USED FOR BUSINESS PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES; (b) Lessee is duly organized, validly existing and in good standing under applicable law; (c) Lessee has the power and authority to enter into each of the Fundamental Agreements; (d) all Fundamental Agreements are enforceable against Lessee in accordance with their terms and do not violate or create a default under any instrument or agreement binding on Lessee; (e) there are no pending or threatened actions or proceedings before any court or administrative agency that could have a material adverse effect on Lessee or any Fundamental Agreement, unless such actions are disclosed to Lessor and consented to in writing by Lessor; (f) Lessee shall comply in all material respects with all laws and regulations the violation of which could have a material adverse effect upon the Equipment or Lessee's performance of its obligations under any Fundamental Agreement; (g) each Fundamental Agreement shall be effective against all creditors of Lessee under applicable law, including fraudulent conveyance and bulk transfer laws, and shall raise no presumption of fraud; and (h) all financial statements and other related information furnished by Lessee shall be prepared in accordance with generally accepted accounting principles and shall fairly present Lessee's financial position as of the dates given on such statements.

**21. DEFAULT.** Any of the following shall constitute a default by Lessee (a "Lessee Default") under this Master Agreement and all Leases and Financings: (a) Lessee fails to pay any Rent payment or any other amount payable to Lessor under this Master Agreement or any Schedule within 10 days after its due date; or (b) Lessee defaults on or breaches any of the other terms and conditions of any Material Agreement, and fails to cure such breach within 10 business days after receiving written notice thereof from Lessor; or (c) any representation or warranty made by Lessee in any Material Agreement proves to be incorrect in any material respect when made or reaffirmed; or (d) Lessee or Guarantor sells or otherwise disposes of all or substantially all of its assets, consolidates with or merges with or into any entity or incurs a substantial amount of indebtedness other than in the ordinary course of its business (unless consented to in advance

by Lessor; provided, however, that no Lessee Default shall occur as a result of Lessee's written notice to Lessor that it is entering into a merger or similar consolidation with a company, in Lessor's opinion, which (i) results in an entity of equal or greater financial strength as Lessee, and (ii) has by law assumed all obligations of Lessee under this Master Agreement; or (e) Lessee or Guarantor dissolves or otherwise terminates its existence, ceases to do business, or becomes insolvent or fails generally to pay its debts as they become due; or (f) any Equipment is levied against, seized or attached; or (g) Lessee or Guarantor makes an assignment for the benefit of creditors, or (h) a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency or receivership law is filed by or against Lessee or Guarantor (and, if such proceeding is involuntary, it is not dismissed within 60 days after the filing thereof) or Lessee or Guarantor takes any action to authorize any of the foregoing matters; or (i) any letter of credit or guaranty issued in support of a Lease or Financing is revoked, breached, cancelled or terminated (unless consented to in advance by Lessor); or (j) any Guarantor fails to fulfil its obligations in favor of Lessor pursuant to its guaranty.

Any of the following shall constitute a default by Lessor (a "Lessor Default") under this Master Agreement and (i) the applicable Lease(s) or Financing(s) (in the case of a Lessor Default described in clauses (w) or (x) below, or (ii) all Leases and Financings (in the case of a Lessor Default described in clauses (y) or (z) below: (w) Lessor breaches its covenant of quiet enjoyment set forth in Section 18 and fails or is unable to cure such breach within 10 days after written notice thereof from Lessee; or (x) Lessor fails to pay Seller (or in the case of Financed Items, Lessee or such other party as Lessee or Seller shall have directed in writing) for any Equipment or Financed Items within 30 days after Lessor's receipt of a properly completed and executed Acceptance Certificate and all other documentation necessary to establish Lessee's acceptance of such Equipment or Financed Items under a Lease or Financing, respectively, and such failure continues for more than 10 days after written notice thereof from Lessee; or (y) Lessor makes an assignment for the benefit of creditors; or (z) a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency or receivership law is filed by or against Lessor (and, if such proceeding is involuntary, it is not dismissed within 60 days after the filing thereof).

**22. REMEDIES.** If a Lessee Default occurs, Lessor may, in its sole discretion, exercise one or more of the following remedies: (a) declare all amounts due and to become due under any or all Leases and Financings to be immediately due and payable; or (b) terminate this Master Agreement or any Lease or Financing; or (c) take possession of, or render unusable, any Equipment wherever the Equipment may be located, without demand or notice and without any court order or other process of law in accordance with Lessee's reasonable security procedures, and no such action shall constitute a termination of any Lease; or (d) require Lessee to deliver the Equipment to a location specified by Lessor; or (e) declare the Stipulated Loss Value for any or all Equipment to be due and payable as liquidated damages for loss of a bargain and not as a penalty and in lieu of any further Rent payments under the applicable Lease or Leases; or (f) proceed by court action to enforce performance by Lessee of any Lease or Financing and/or to recover all damages and expenses incurred by Lessor by reason of any Lessee Default; or (g) terminate any other agreement that Lessor may have with Lessee; or (h) exercise any other right or remedy available to Lessor at law or in equity. Also, Lessee shall pay Lessor all costs and expenses that Lessor may incur to maintain, safeguard or preserve the Equipment, and other expenses incurred by Lessor in enforcing any of the terms, conditions or provisions of this Master Agreement (including reasonable legal fees and collection agency costs). Upon repossession or surrender of any Equipment, Lessor shall lease, sell or otherwise dispose of the Equipment in a commercially reasonable manner, with or without notice and at public or private sale, and apply the net proceeds thereof to the amounts owed to Lessor hereunder, but only after deducting (i) in the case of a sale, the estimated Fair Market Value of the Equipment sold as of the scheduled expiration of the Then Applicable Term of the related Lease, (ii) in the case of a lease, the rent due for any period beyond the scheduled expiration of the Then Applicable Term of the related Lease, and (iii) in either case, all expenses (including reasonable legal fees and costs) reasonably incurred by Lessor in connection therewith; provided, however, that Lessee shall remain liable to Lessor for any deficiency that remains after any sale or lease of such Equipment. Any proceeds of any sale or lease of such Equipment in excess of the amounts owed to Lessor hereunder shall be retained by Lessor. Lessee agrees that with respect to any notice of a sale required by law to be given, 10 days' notice shall constitute reasonable notice. Upon payment of all past due Rent and the Stipulated Loss Value as provided in clause (e) above, together with interest at the rate of 1-1/2% per month (or such lesser rate as is the maximum rate allowable under applicable law) from the date declared due until paid, Lessor will transfer to Lessee all of Lessor's interest in the Equipment for which such Rent and Stipulated Loss Value has been paid, which transfer shall be on an "AS IS, WHERE IS" basis,

without any warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor. These remedies are cumulative of every other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise, and may be enforced concurrently therewith or from time to time.

If a Lessor Default occurs, Lessee's sole and exclusive remedy shall be to recover by appropriate legal proceedings any direct damages suffered by Lessee as a result of such Lessor Default and any reasonable and necessary expenses (including, without limitation, court costs and reasonable legal fees) incurred by Lessee in connection therewith.

23. PERFORMANCE OF LESSEE'S OBLIGATIONS. If Lessee fails to perform any of its obligations hereunder, Lessor may perform any act or make any payment that Lessor deems reasonably necessary for the maintenance and preservation of the Equipment and Lessor's interests therein; provided, however, that the performance of any act or payment by Lessor shall not be deemed a waiver of, or release Lessee from, the obligation at issue. All sums so paid by Lessor, together with expenses (including legal fees and costs) incurred by Lessor in connection therewith, shall be paid to Lessor by Lessee immediately upon demand.

24. TRUE LEASE; SECURITY INTEREST; MAXIMUM RATE. Each Lease is intended to be a "Finance Lease" as defined in Article 2A of the UCC, and Lessee hereby authorizes Lessor to file a financing statement to give public notice of Lessor's ownership of the Equipment. Lessee, by its execution of each Schedule, acknowledges that Lessor has informed it that (a) the identity of Seller is set forth in the applicable Schedule, (b) Lessee is entitled under Article 2A to the promises and warranties, including those of any third party, provided to Lessor in connection with, or as a part of, the applicable Purchase Documents, and (c) Lessee may communicate with Seller and receive an accurate and complete statement of the promises and warranties, including any disclaimers and limitations of them or of remedies. If (1) notwithstanding the express intention of Lessor and Lessee to enter into a true lease, any Lease is ever deemed by a court of competent jurisdiction to be a lease intended for security, or (ii) Lessor and Lessee enter into a Financing with the intention that it be treated as a lease intended as security by so providing in the applicable Schedule, or (iii) Lessor and Lessee enter into a Financing, then to secure payment and performance of Lessee's obligations under this Master Agreement and all Leases and Financings, Lessee hereby grants Lessor a purchase money security interest in the related Equipment and Financed Items and in all attachments, accessories, additions, substitutions, products, replacements, rentals and proceeds (including, without limitation, insurance proceeds) thereto as well as a security interest in any other equipment financed pursuant to this Master Agreement or any other such event, notwithstanding any provision contained in this Master Agreement or in any Schedule, neither Lessor nor any Assignee shall be entitled to receive, collect or apply as interest any amount in excess of the maximum rate or amount permitted by applicable law. In the event Lessor or any Assignee ever receives, collects or applies as interest any amount in excess of the maximum amount permitted by applicable law, such excess amount shall be applied to the unpaid principal balance and any remaining excess shall be refunded to Lessee. In determining whether the interest paid or payable under any specific contingency exceeds the maximum rate or amount permitted by applicable law. Lessor and Lessee shall, to the maximum extent permitted under applicable law, characterize any non-principal payment as an expense or fee rather than as interest, exclude voluntary prepayments and the effect thereof, and spread the total amount of interest over the entire term of this Master Agreement and all Leases and Financings.

25. ASSIGNMENT. Lessor shall have the unqualified right to sell, assign, pledge, transfer, mortgage or otherwise convey any part of its interest in this Master Agreement, any Schedule or any Equipment, in whole or in part, without prior notice to or the consent of Lessee. If any Lease is assigned, Lessee shall (a) unless otherwise specified by Lessor and the Assignee, pay all amounts due under the applicable Schedule to such Assignee, notwithstanding any defense, setoff or counterclaim whatsoever that Lessee may have against Lessor or Assignee; (b) not permit the applicable Schedule to be amended or the terms thereof waived without the prior written consent of the Assignee, (c) not require the Assignee to perform any obligations of Lessor, other than those that are expressly assumed in writing by such Assignee; and (d) execute such acknowledgments thereto as may be requested by Lessor or the Assignee. It is further agreed that (i) each Assignee shall be entitled to all of Lessor's rights, powers and privileges under the applicable Lease or Financing, to the extent assigned; (ii) any Assignee may reassign its rights and interests under the applicable Lease or Financing with the same force and effect as the assignment described herein; and (iii) any payments received by the Assignee from Lessee with respect to the assigned portion of the Lease or Financing shall, to the extent

thereof, discharge the obligations of Lessee to Lessor with respect to the assigned portion of the Lease or Financing. Lessee acknowledges that any assignment or transfer by Lessor or any Assignee shall not materially change Lessee's obligations under the assigned Lease or Financing.

Upon Lessor's prior written consent, which shall not be unreasonably withheld, Lessee may sublet the Equipment to another end user other than another leasing company or other company or Lessor. No such sublease shall relieve Lessee of its obligations under the Lease and Lessee shall be responsible for all costs and expenses associated with such sublease, including, without limitation, additional Taxes or any Tax Loss suffered by Lessor. Lessee may permit use of the Equipment by its affiliates or independent contractors at the Equipment Location provided it does not relinquish possession and control of the Equipment. Any corporation which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, Lessee (each an "Affiliate"), it may enter into a Lease or Financing under and subject to the terms and conditions of this Master Agreement by executing a Schedule incorporating this Master Agreement by reference, in which case such Lessee Affiliate shall be deemed, for purposes of such Lease or Financing to be the "Lessee" under this Master Agreement. The undersigned Lessee hereby unconditionally guarantees to Lessee the full and prompt payment, observance and performance when due of all obligations of all Lessee Affiliates (collectively, "Guaranteed Obligations") under all such Leases or Financing. The foregoing guarantee is absolute, continuing, unlimited and independent and shall not be affected, diminished or released for any reason whatsoever. The undersigned Lessee waives diligence, presentment, demand for payment, protest or notice of any Lessee Default or nonperformance by any Lessee Affiliate, all affirmative defenses, offsets and counterclaims against Lessor, any right to the benefit of any security or statute of limitations, and any requirement that Lessor proceed first against a Lessee Affiliate or any collateral security. Until the Guaranteed Obligations shall have been paid in full, Lessee shall have no right of subrogation. In addition, Lessee shall have the right to assign its rights with respect to any Lease or Financing or sublease the Equipment leased pursuant to any Lease or Financing to any Lessee Affiliate without the consent of Lessor, provided that any such sublease shall in no expressly provide that the sublessee's rights thereunder are subject and subordinate to the rights of Lessor hereunder, and (ii) not contain any provisions which would constitute a result in any Lessee Default hereunder. No such assignment or sublease shall relieve Lessee of any of its obligations under the applicable Schedule or this Master Agreement. Lessee shall promptly notify Lessor of any such assignment or sublease and shall execute and deliver to Lessor or any Assignee, at Lessee's expense, such documentation as Lessor or such Assignee may reasonably require, including documentation to evidence and put third parties on notice of Lessor's or such Assignee's interest in the Equipment. Except as set forth in this paragraph Lessee may not assign, transfer or otherwise dispose of this Master Agreement, any Lease or Financing, any Equipment or any interest therein.

26. FURTHER ASSURANCES. Lessee agrees to promptly execute and deliver to Lessor such further documents and take such further action as Lessor may require in order to more effectively carry out the intent and purpose of this Master Agreement and any Schedule. Without limiting the generality of this foregoing, Lessee agrees (a) to furnish to Lessor from time to time, its certified financial statements, officer's certificates and appropriate resolutions, opinions of counsel and such other information and documents as Lessor may reasonably request, and (b) to execute and timely deliver to Lessor any financing statements or other documents that Lessor deems necessary to perfect or protect Lessor's security interest in the Collateral or to evidence Lessor's interest in the Equipment. If Lessee fails to execute any document referred to in clause (b) of the preceding sentence, Lessor or Lessor's agent is hereby authorized to sign and file the same as Lessee's agent. It is also agreed that Lessor or Lessor's agent may file as a financing statement, any lease document (or copy thereof, where permitted by law) that Lessor deems appropriate to perfect or protect Lessor's security interest in the Collateral or to evidence Lessor's interest in the Equipment. Upon demand, Lessee will promptly reimburse Lessor for any filing or recordation fees or expenses (including legal fees and costs) incurred by Lessor in perfecting or protecting its interests in the Equipment.

27. TERM OF MASTER AGREEMENT; SURVIVAL. This Master Agreement shall commence and be effective upon the execution hereof by both parties and shall continue in effect until terminated by either party by 30 days' prior written notice to the other. However, no termination of this Master Agreement pursuant to the preceding sentence shall be effective with respect to any Lease or Financing that commenced prior to such termination until the expiration or termination of such Lease or Financing and the satisfaction by Lessee of all of its obligations hereunder with respect thereto. All representations, warranties and covenants made by Lessee hereunder shall survive the termination of this Master Agreement and shall remain in full force and effect. All of Lessor's rights, privileges and indemnities under this Master Agreement or any Lease or Financing, to the extent they are fairly attributable to events or conditions occurring or existing on or prior to the expiration or termination of such Lease or Financing, shall survive such expiration or termination and be enforceable by Lessor and Lessor's successors and assigns.

28. WAIVER OF JURY TRIAL. LESSEE AND LESSOR HEREBY EXPRESSLY WAIVE ANY RIGHT TO DEMAND A JURY TRIAL WITH RESPECT TO ANY ACTION OR PROCEEDING INSTITUTED

BY LESSOR OR LESSEE IN CONNECTION WITH THIS MASTER AGREEMENT OR ANY FUNDAMENTAL AGREEMENT.

**29. NOTICES.** All notices, requests, demands, waivers and other communications required or permitted to be given under this Master Agreement or any other Fundamental Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or mailed via certified mail or a nationally recognized overnight courier service, or sent by confirmed facsimile transmission, addressed as follows for such other address or fax number as either party shall so notify the other:

If to Lessor:

Compaq Financial Services Corporation
100 Woodbridge Center Drive, Suite 202
Woodbridge, New Jersey 07095
Attn:  Vice President, Operations and Credit
Fax:  (888) 202-4271
Authorized Lessor E-mail Address:  electronicacceptance@compaq.com

If to Lessee:

Resource Bancshares Mortgage Group, Inc.‗‗‗‗‗‗‗‗
7909 Parklane Road ‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗
Columbia, SC 29223 ‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗
Attn: ‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗
Fax:     Authorized Lessee Representatives and Authorized Lessee E-mail
Addresses:
‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗
Lessee Acceptance Confirmation Fax Number: ‗‗‗‗‗‗‗‗

**30. MISCELLANEOUS.**

(a) **Governing Law.** THIS MASTER AGREEMENT AND EACH LEASE AND FINANCING SHALL BE GOVERNED BY THE INTERNAL LAWS (AS OPPOSED TO CONFLICTS OF LAW PROVISIONS) OF THE STATE OF NEW JERSEY.

(b) **Consent to Jurisdiction.** Lessor and Lessee consent to the jurisdiction of any local, state or Federal court located within the State of New Jersey, and waive any objection relating to improper venue or forum non conveniens to the conduct of any proceeding in any such court.

(c) **Credit Review.** Lessee consents to a reasonable credit review by Lessor for each Lease and Financing.

(d) **Captions and References.** The captions contained in this Master Agreement and any Schedule are for convenience only and shall not affect the interpretation of this Master Agreement. All references in this Master Agreement to Sections and Exhibits refer to Sections hereof and Exhibits hereto unless otherwise indicated.

(e) **Entire Agreement; Amendments.** This Master Agreement and all other Fundamental Agreements executed by both Lessor and Lessee constitute the entire agreement between Lessor and Lessee relating to the leasing of the Equipment and the financing of Financed Items, and supersede all prior agreements relating thereto, whether written or oral, and may not be amended or modified except in a writing signed by the parties hereto.

(f) **No Waiver.** Any failure of Lessor to require strict performance by Lessee or any written waiver by Lessor of any provision hereof, shall not constitute consent or waiver of any other breach of the same or any other provision hereof.

(g) **Lessor Affiliates.** Lessee understands and agrees that Compaq Financial Services Corporation or any affiliate or subsidiary thereof may, as lessor, execute Advance Pricing Agreements and Schedules under this Master Agreement, in which event the terms and conditions of the applicable Advance Pricing Agreement or Schedule and this Master Agreement as it relates to the lessor under such Advance Pricing Agreement or Schedule shall be binding upon and shall inure to the benefit of such entity executing such Advance Pricing Agreement or Schedule as lessor, as well as any successors or assigns of such entity.

(h) **Invalidity.** If any provision of this Master Agreement or any Schedule shall be prohibited by or invalid under law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Master Agreement or such Schedule.

(i) **Counterparts.** This Master Agreement may be executed in counterparts, which collectively shall constitute one document.

(j) **Lessor Reliance.** Lessor may act in reliance upon any instruction, instrument or signature reasonably believed by Lessor in good faith to be genuine. Lessor may assume that any employee of Lessee who executes any document or gives any written notice, request or instruction has the authority to do so.

**31. DEFINITIONS.** All capitalized terms used in this Master Agreement have the meanings set forth below or in the Sections of this Master Agreement referred to below.

"**Acceptance Date**" means, as to any Lease or Financing, the date Lessee shall have accepted the Equipment or Financed Items subject to such Lease or Financing in accordance with Section 3.

"**Advance Pricing Agreement**" means an Advance Pricing Agreement executed by Lessor and Lessee pursuant to Section 2.B.

"**Advance Rent**" means, as to any Lease, Rent paid by Lessee in advance of the Acceptance Date for the related Equipment or otherwise intended to be treated as "Advance Rent" under this Master Agreement and the applicable Schedule.

"**Amount Available**" has the meaning specified in an Advance Pricing Agreement.

"**Assignee**" means any assignee of all or any portion of Lessor's interest in this Master Agreement, any Schedule or any Equipment, whether such assignee received the assignment of such interest from Lessor or a previous assignee of such interest.

"**Casualty Loss**" means, with respect to any Equipment, the condemnation, taking, loss, destruction, theft or damage beyond repair of such Equipment.

"**Casualty Value**" means, as to any Equipment, an amount determined as of the date of the Casualty Loss or Lessee Default in question pursuant to a "Table of Casualty Values" attached to the applicable Schedule or, if no "Table of Casualty Values" is attached to the applicable Schedule, an amount equal to the sum of (i) the present value as of the date of the Casualty Loss or Lessee Default in question (discounted at 5% per annum, compounded monthly) of all Rent payments payable after such date through the scheduled date of expiration of the Then Applicable Term, plus (ii) the present value as of the date of the Casualty Loss or Lessee Default in question (discounted at 5% per annum, compounded monthly, from the scheduled date of expiration of the Then Applicable Term) of an amount determined by multiplying the applicable casualty percentage specified below by the Total Cost of such Equipment. The applicable casualty percentage shall be 35% for Equipment having an Initial Term of less than 24 months; 30% for Equipment having an Initial Term of 24 months or greater, but less than 36 months; 25% for Equipment having an Initial Term of 36 months or greater, but less than 48 months; and 20% for Equipment having an Initial Term of 48 months or greater.

"**Claims**" means all claims, actions, suits, proceedings, costs, expenses (including, without limitation, court costs, witness fees and attorneys' fees), damages, obligations, judgments, orders, penalties, fines, injuries, liabilities and losses, including, without limitation, actions based on Lessor's strict liability in tort.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" has the meaning specified in Section 24.

"**Commitment Period**" means the period during which Lessor will purchase Equipment and fund Financed Items and enter into a Lease or Financing of the same with Lessee pursuant to Section 2.B and an Advance Pricing Agreement at the rates set forth in such Advance Pricing Agreement, which period shall be specified in such Advance Pricing Agreement.

"**Consolidation Schedule**" has the meaning specified in Section 2 B(d).

"**Consolidation Period**" has the meaning specified in an Advance Pricing Agreement.

"**Daily Rent**" means, as to any Lease or Financing, an amount equal to the per diem Rent payable under the applicable Schedule (calculated on the basis of a 360 day year and 30 day months).

"**End-of-Term Notice**" means, as to any Lease, a written notice delivered by Lessee to Lessor at least 90 days prior to the end of the Initial Term, any Renewal Term or any optional extension of the Initial Term or any Renewal Term setting forth Lessee's elections pursuant to Section 4 with respect to the Equipment subject to such Lease. Each End-of-Term Notice shall specify with particularity the Units of Equipment to be purchased by Lessee (if any), as to which the Lease is to be renewed (if any) and that are to be returned to Lessor (if any).

"**Equipment Location**" means, as to any Equipment, the address at which such Equipment is located from time to time, as originally specified in the applicable Schedule and as subsequently specified in a notice delivered to Lessor pursuant to Section 11, if applicable.

"**Equipment**" has the meaning specified in Section 1.

"**Fair Market Value**" means the total price that would be paid for any specified Equipment in an arm's length transaction between an informed and willing buyer (other than a used equipment dealer) under no compulsion to buy and an informed and willing seller under no compulsion to sell. Such total price shall not be reduced by the costs of removing such Equipment from its current location or moving it to a new location.

"**Fair Rental Value**" means the amount of periodic rent that would be payable for any specified Equipment in an arm's length transaction between an

8899 Rev
7

informed and willing lessor and an informed and willing lessee, neither under compulsion to lease. Such amount shall not be reduced by the costs of renewing such Equipment from its current location or moving it to a new location.

"Final Invoice Amount" has the meaning set forth in Section 2.A (c).

"Financed Item" has the meaning specified in Section 1.

"Financing" has the meaning specified in Section 1.

"First Payment Date" means, as to any Lease or Financing, the date the first Rent payment with respect to the Initial Term of such Lease or the Term of such Financing (as applicable) is due, as determined pursuant to the terms of the applicable Schedule.

"Fundamental Agreements" means, collectively, this Master Agreement, each Advance Pricing Agreement, each Schedule and Acceptance Certificate and all other related instruments and documents.

"Funding Date" means, with respect to any Financed Item, the date Lessor makes funds available to the Seller of such Financed Item to pay for the same or to Lessee to reimburse Lessee for its payment of the same.

"Guarantor" means any guarantor of all or any portion of Lessee's obligations under this Master Agreement or any Lease or Financing.

"Hardware" means items of tangible equipment.

"Initial Term" means, as to any Lease, the initial term thereof as specified in the related Schedule.

"Lease" has the meaning specified in Section 1.

"Lessee" has the meaning specified in the preamble hereof.

"Lessee Default" has the meaning specified in Section 21.

"Lessor" has the meaning specified in the preamble hereof.

"Lessor Default" has the meaning specified in Section 21.

"License Agreement" means any license agreement or other document granting the purchaser the right to use Software or any technical information, confidential business information or other documentation relating to Hardware or Software, as amended, modified or supplemented by any other agreement between the licensor and Lessor.

"Master Agreement" has the meaning specified in the preamble hereof.

"Material Agreements" means, collectively, all Fundamental Agreements, all other material agreements by and between Lessor and Lessee, and any application for credit, financial statement, or financial data required to be provided by Lessee in connection with any Lease or Financing.

"Optional Additions" has the meaning specified in Section 12.

"PC Equipment" means, collectively, personal computers (e.g. workstations, desktops and notebooks) and related items of peripheral equipment (e.g., monitors, printers and docking stations).

"Purchase Documents" means, as to any Equipment, any purchase order, contract, bill of sale, License Agreement, invoice and/or other documents that Lessor has, at any time, approved, agreed to be bound by or entered into with any Supplier of such Equipment relating to the purchase, ownership, use or warranty of such Equipment.

"Renewal Agreement" has the meaning specified in Section 4.

"Renewal Term" has the meaning specified in Section 4.

"Rent" has the meaning specified in Section 5.

"Schedule" means, unless the context shall otherwise require (a) in the case of a Lease or Financing commenced pursuant to Section 2.A, a Schedule executed by Lessor and Lessee pursuant to Section 2.A(a), and (b) in the case of a Lease or Financing commenced pursuant to Section 2.B, (i) prior to Lessee's execution and delivery to Lessor of a Consolidating Schedule pursuant to Section 2.B(d) relating to such Lease or Financing, the applicable Certificate of Acceptance together with the applicable Advance Pricing Agreement, and (ii) from and after Lessee's execution and delivery to Lessor of a Consolidating Schedule pursuant to Section 2.B(d) relating to such Lease or Financing, such Consolidating Schedule.

"Seller" means, as to any Equipment, the seller of such Equipment, and as to any Financed Item, the provider thereof, in either case as specified in the applicable Schedule.

"Software" means copies of computer software programs owned or licensed by Lessor.

"Stipulated Loss Value" means, as to any Equipment, an amount equal to the sum of (i) all Rent and other amounts due and owing with respect to such Equipment as of the date of payment of such amount, plus (ii) the Casualty Value of such Equipment.

"Substitute Equipment" means, as to any item of Hardware or Software subject to a Lease, a substantially equivalent or better item of Hardware or Software having equal or greater capabilities and equal or greater Fair Market Value manufactured or licensed by the same manufacturer or licensor as such item of Hardware or Software subject to a Lease. The determination of whether any item of Equipment is substantially equivalent or better than an item of Equipment subject to a Lease shall be based on all relevant facts and circumstances, but shall minimally require, in the case of a computer, that each of processor, hard-drive, random access memory and CD ROM drive, if applicable, be equivalent or better.

"Supplier" means (a) as to any Equipment, the Seller and the manufacturer or licensor of such Equipment collectively, or where the context requires, any of them; and (b) as to any Financed Item, the Seller thereof.

"System Software" means an item of Software that is pre-loaded on an item of Hardware and whose Purchase Documents specify no purchase price separate from the aggregate purchase price specified for such items of Hardware and Software.

"Taxes" means all license and registration fees and all taxes, fees, levies, imposts, duties, assessments, charges and withholding of any nature whatsoever, however designated (including, without limitation, any value added, transfer, sales, use, gross receipts, business, occupation, excise, personal property, real property, stamp or other taxes).

"Tax Benefits" has the meaning specified in Section 17.

"Tax Loss" has the meaning specified in Section 17.

"Term" means, as to any Financing, the term thereof as specified in the related Schedule.

"Then Applicable Term" means, as to any Lease, the term of the Lease in effect at the time of determination, whether it be the Initial Term, any Renewal Term or any optional or other automatic extension of the Initial Term or any Renewal Term pursuant to Section 4.

"Total Cost" means (a) as to any Lease, the total acquisition cost to Lessor of the Equipment subject to such Lease as set forth in the applicable Purchase Documents, including related delivery, installation, taxes and other charges which Lessor has agreed to pay and treat as a portion of such acquisition cost, if any, and (b) as to any Financing, the total amount of the Financed Items subject to such Financing.

"Total Term" means, as to any Lease, the aggregate term of such Lease, including the Initial Term, any Renewal Term and any optional or other automatic extension of the Initial Term or any Renewal Term pursuant to Section 4.

"UCC" means the Uniform Commercial Code as enacted and in effect in any applicable jurisdiction.

"Unit of Equipment" means, as to the Equipment leased pursuant to any Schedule (a) each individual item of PC Equipment leased pursuant to such Schedule, and (b) all Equipment leased pursuant to such Schedule other than PC Equipment taken as a whole.

"Valid E-mail Acceptance Certificate" has the meaning specified in Section 3(b).

32. Lessee acknowledges that neither this Master Agrement nor any other Fundamental Agreement may be amended or modified except by a writing signed by Lessor and Lessee. Lessee Initials: ___

IN WITNESS WHEREOF, LESSOR AND LESSEE HAVE EXECUTED THIS MASTER AGREEMENT ON THE DATES SPECIFIED BELOW.

LESSOR:
COMPAQ FINANCIAL SERVICES CORPORATION



BY: ___

Name and Title

Date

LESSEE:
RESOURCE BANCSHARES MORTGAGE GROUP, INC.

BY: ___

STEVEN F. HERBERT
CORPORATE SENIOR EXECUTIVE VICE PRESIDENT AND
CORPORATE CHIEF FINANCIAL OFFICER
Name and Title

11-22-99
Date

NOV 24 1999

8/99 Rev
8



i n v e n t

## hp financial services

### ASSUMPTION AGREEMENT

This ASSUMPTION AGREEMENT, dated as of November 14, 2002, is by and between NETBANK, INC. ("New Lessee") and HEWLETT-PACKARD FINANCIAL SERVICES COMPANY ( f/k/a Compaq Financial Services Corporation) ("Lessor").

Resource Bancshares Mortgage Group, Inc. ("Original Lessee") and Lessor entered into that certain Master Lease and Financing Agreement Number100738 dated November 4, 1999 (the "Master Agreement"), certain Schedules pursuant thereto (collectively, the "Schedules") and other ancillary agreements and documents (the Master Agreement, Schedules and other documents and agreements are hereinafter collectively referred to as the "Lease Documents") pursuant to which Original Lessee leased from Lessor certain items of Hardware, Software, or both, identified therein ("the Equipment") and financed with Lessor certain fees and other one time charges ("Financed Items"). Such Master Agreement is appended hereto as Attachment A and incorporated herein and made a part hereof by reference, and the Schedules identified in Attachment B are incorporated herein and made a part hereof by reference. Capitalized terms used in this Assumption Agreement not otherwise defined herein shall have the respective meanings given to such terms in the Master Agreement.

Pursuant to the Lease Documents, Original Lessee is currently indebted to Lessor in accordance with the terms thereof.

Pursuant to the Lease Documents, Lessor is the owner of and has been granted a security interest in the Equipment and in all accessories, attachments, additions, products, replacements, rentals, proceeds and substitutions now or hereafter affixed thereto.

New Lessee has acquired Original Lessee and has merged Original Lessee into New Lessee. In connection with such merger, New Lessee desires to lease Equipment and/or finance Financed Items as provided in the Master Agreement and to assume all of the obligations of Original Lessee under the Master Agreement. Lessor is willing to give its written consent to such assumption, provided that New Lessee executes and delivers this Assumption Agreement.

NOW THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Lessor consents to the assumption by New Lessee of all the obligations of Original Lessee under the Master Agreement and to New Lessee's taking possession of the Equipment. New Lessee hereby assumes all of the obligations of Original Lessee under the Lease Documents, including the obligation to pay Lessor any and all amounts due and owing and/or to become due and owing under the Lease Documents, including, but not limited to, all Rent payments, late charges, administrative fees and Taxes, which shall be paid to Lessor in accordance with the terms and conditions of the Lease Documents.

2.  New Lessee agrees not to assert against Lessor any defense, setoff, recoupment, claim or counterclaim which New Lessee may have against Original Lessee with respect to the Lease Documents, Equipment, Financed Items and/or this Assumption Agreement.

3.  The Equipment shall remain Lessor's personal property whether or not affixed to realty and shall not be deemed to be, or to become, a fixture by reason of the manner of its installation, and the Equipment is or will be located at the Equipment Location specified in the applicable Schedules, and will not be moved from such location without Lessor's prior written consent.

4.  New Lessee acknowledges that Lessor has valid title to, and a first security interest in, the Equipment and in confirmation thereof, agrees to execute all financing statements and other documents which Lessor may, in its sole discretion, deem necessary to protect such title or security interest.

5.  New Lessee shall pay or reimburse Lessor, for all costs which may be deemed necessary by Lessor in connection with this Assumption Agreement, such as filing fees and expenses related to obtaining consents and releases from third parties. New Lessee agrees to execute any documents that Lessor deems necessary in connection with this Assumption Agreement. New Lessee hereby grants to Lessor a power of attorney to sign, where permitted by applicable law, financing statements on behalf of New Lessee and hereby authorizes Lessor to file such financing statements with the appropriate governmental authority.

6.  New Lessee shall indemnify and hold Lessor harmless from any demands, claims, proceedings, liabilities and/or costs relative to this Assumption Agreement and the assignments and assumptions contained herein.

7.  Notices to New Lessee with respect to the Lease Documents or this Assumption Agreement shall be delivered to New Lessee at the address set forth in the Master Agreement for the delivery of such notices.

8.  If any provision of this Assumption Agreement shall be prohibited by or invalid under law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Assumption Agreement.

9.  THIS ASSUMPTION AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES. This Assumption Agreement shall not become effective until it is executed on behalf of Lessor at its home office in New Jersey.

IN WITNESS WHEREOF, the parties hereto have executed this Assumption Agreement as of the date and year first above written.

NEW LESSEE: NETBANK, INC.

By: _____

Name: Steve Herbst

Title: CEO

LESSOR: HEWLETT-PACKARD FINANCIAL SERVICES COMPANY

By: _____

Name: DOUGLAS R. AHRENS

Title: Operations Manager

2

# AMENDMENT NO. 1 TO MASTER LEASE AND FINANCING AGREEMENT

THIS AMENDMENT NO. 1 TO MASTER LEASE AND FINANCING AGREEMENT (this "Amendment") made as of this 14th day of November, 2002 by and between HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, formerly known as Compaq Financial Services Corporation ("HPFS"), and NETBANK, INC. ("NetBank").

## WITNESSETH:

WHEREAS:

A. NetBank has assumed the obligations of Resource Bancshares Mortgage Group, Inc. ("RBMG") under a Master Lease and Financing Agreement Number 100738 dated November 4, 1999 (collectively, the "Master Agreement") originally entered into between RBMG and Compaq Financial Services Corporation ("CFS") pursuant to which CFS agreed to (i) purchase and lease to NetBank certain equipment and/or (ii) finance certain fees and one time charges as listed on Master Lease Schedules thereto;

B. CFS changed its name to HP Financial Services Company ("HP Financial") as of May 30, 2002 and HP Financial changed its name to Hewlett-Packard Financial Services Company as of June 24, 2002; and

C. HPFS and NetBank desire to amend the Master Agreement and all other related agreements executed in connection therewith to (i) provide for leasing to affiliates of NetBank under the Lease Agreement and (ii) to reflect CFS's name change.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, it is hereby agreed as follows:

1. Definitions. Unless otherwise defined herein, words and expressions defined in the Lease Agreement, as amended hereby, shall bear the same meanings when used herein.

2. Amendment.

    a. Section 30 shall be amended by adding the following provision at the end of the Section:

    **(k)  Lessee Affiliates.** Any corporation which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, Lessee (a "Lessee Affiliate"), may enter into a Lease or Financing under and subject to the terms and conditions of this Master Agreement by executing a Schedule incorporating this Master Agreement by reference, in which case such Lessee Affiliate shall be deemed, for purposes of such Lease or Financing to be the "Lessee" under this Master Agreement. The undersigned

Lessee hereby unconditionally guarantees to Lessor the full and prompt payment, observance and performance when due of all obligations of all Lessee Affiliates (collectively, "Guaranteed Obligations") under all such Leases and Financings. The foregoing guarantee is absolute, continuing, unlimited and independent and shall not be affected, diminished or released for any reason whatsoever. The undersigned Lessee waives diligence, presentment, demand for payment, protest or notice of any Lessee Default or nonperformance by any Lessee Affiliate, all affirmative defenses, offsets and counterclaims against Lessor, any right to the benefit of any security or statute of limitations, and any requirement that Lessor proceed first against a Lessee Affiliate or any collateral security. Until the Guaranteed Obligations shall have been paid in full, Lessee shall have no right of subrogation.

b. The definition of "Lessor" in the Master Agreement, each Schedule and all other related documents shall be amended by inserting the name "Hewlett-Packard Financial Services Company" in place of "Compaq Financial Services Corporation".

c. The Lessee's notice information listed in Section 29 shall be amended to read as follows:

If to Lessee:    NetBank, Inc.
                 11475 Great Oaks Way
                 Alpharetta, Georgia 30022
                 Attn: Todd Warnock

3. No Other Amendment. All other terms and conditions of the Master Agreement shall remain in full force and effect and the Master Agreement, all Schedules, Acceptance Certificates, and all other related agreements executed in connection therewith shall be read and construed as if the terms of this Amendment were included therein.

4. GOVERNING LAW. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to Master Lease Agreement to be executed and delivered the day and year first written above.

HEWLETT-PACKARD FINANCIAL SERVICES COMPANY

By:

Name:  DOUGLAS R. AHRENS

Title:  Operations Manager

NETBANK, INC.

By:

Name: Steve Herbert

Title: CFO

| Lease Number | Applied Credit | Remaining Amt Due | | |
|---|---|---|---|---|
| 100738000011 | Outstanding | $57.08 | | |
| 100738000017 | Outstanding | $4,062.94 | | |
| 100738000019 | Outstanding | $177.81 | | |
| 100738000021 | Outstanding | $2,293.38 | | |
| 100738000022 | Outstanding | $4,180.36 | | |
| 100738000023 | Outstanding | $3,877.27 | | |
| 100738000024 | Outstanding | $2,409.35 | | |
| 100738000026 | Outstanding | $107,007.28 | | |
| 100738000027 | Outstanding | $513.60 | | |
| 100738000028A | Outstanding | $81,905.15 | | |
| 100738000029A | Outstanding | $10,897.39 | | |
| 100738000030 | Outstanding | $64,480.16 | | |
| 100738000031 | Outstanding | $50,549.12 | | |
| 100738000032 | Outstanding | $7,902.10 | | |
| 100738000033 | Outstanding | $34,974.73 | | |
| 100738000033 | Unbilled 1 month remaining | $17,447.61 | | $52,422.34 |
| 100738000034 | Outstanding | $8,501.86 | | |
| 100738000034 | Unbilled 1 month remaining | $4,250.93 | | $12,752.79 |
| 100738000035 | Outstanding | $48,355.36 | | |
| 100738000035 | Unbilled 1 month remaining | $24,177.68 | | $72,533.04 |
| 100738000036 | Outstanding | $78,441.08 | | |
| 100738000036 | Unbilled 1 month remaining | $39,220.54 | 39220.54 | $117,661.62 |
| 100738000037 | Outstanding | $192,325.82 | | |
| 100738000037 | Unbilled 2 month remaining | $192,325.82 | 192325.8 | $384,651.64 |
| 100738000038 | Outstanding | $11,778.78 | | |
| 100738000038 | Unbilled 2 month remaining | $11,778.78 | 11778.78 | $23,557.56 |
| 100738000039 | Outstanding | $34,474.79 | | |
| 100738000039 | Unbilled 2 month remaining | $68,949.58 | 68949.58 | $103,424.37 |
| 100738000040 | Outstanding | $58,296.02 | | |
| 100738000040 | Unbilled 5 month remaining | $145,740.05 | 145740.1 | $204,036.07 |
| 100738000041 | Outstanding | $45,253.20 | | |
| 100738000041 | Unbilled 4 month remaining | $45,253.20 | 45253.2 | $90,506.40 |
| | Grand Total: | $1,401,858.80 | | $1,401,858.80 |

Netbank Republic

| | |
|---|---|
| 0016 | $1,126.58 |
| 0018 | $809.36 |
| 0020 | $3,338.93 |
| 028a Republic | $2,733.48 |
| | $8,008.35 |

$1,409,867.15

# EXHIBIT B

# FDIC®

**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201

Division of Resolutions and Receiverships

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED – 7002 0860 0002 2113 6831**

April 15, 2008

Hewlett-Packard Financial Services Company
Attn: Steve Kopitskie
420 Mountain Avenue
PO Box 6
Murray Hill, NJ 07974

SUBJECT:    10001– NetBank
            Alpharetta, GA – In Receivership
            **NOTICE OF DISALLOWANCE OF CLAIM**

Dear Claimant:

The Receiver of NetBank has reviewed your claim against the receivership. After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s):

> Services used, including equipment not returned, are being reimbursed separately. The remainder of your claim is disallowed as not being proven to the satisfaction of the Receiver.

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced before the appointment of the Receiver) **BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM. 12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" capacity as deposit insurer. An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-2665.

Sincerely,

Jeffry M. Quick
Claims Department

RLS7218

# EXHIBIT C

| Assets still active Billing | | | |
|---|---|---|---|
| Contract Number | Ext Rent | Ext Tax | Total |
| 100,738,000,016.00 | 2,465.16 | 172.60 | 2,637.76 |
| 100,738,000,017.00 | 4,447.38 | 311.34 | 4,758.72 |
| 100,738,000,018.00 | 495.40 | 34.68 | 530.08 |
| 100,738,000,021.00 | 1,542.60 | 108.00 | 1,650.60 |
| 100,738,000,022.00 | 1,408.62 | 98.58 | 1,507.20 |
| 100,738,000,024.00 | 631.29 | 31.50 | 662.79 |
| 100,738,000,026.00 | 32,846.84 | 1,922.80 | 34,769.64 |
| 100,738,000,030.00 | 22,305.20 | 1,457.60 | 23,762.80 |
| 100,738,000,031.00 | 44,522.42 | 2,929.26 | 47,451.68 |
| 100,738,000,032.00 | 4,831.52 | 321.42 | 5,152.94 |
| 100,738,000,033.00 | 44,728.17 | 2,874.12 | 47,602.29 |
| 100,738,000,034.00 | 8,180.82 | 572.64 | 8,753.46 |
| 100,738,000,035.00 | 24,217.24 | 1,695.27 | 25,912.51 |
| 100,738,000,036.00 | 55,723.95 | 3,900.57 | 59,624.52 |
| 100,738,000,037.00 | 28,259.94 | 1,978.17 | 30,238.11 |
| 100,738,000,039.00 | 28,006.95 | 1,960.47 | 29,967.42 |
| 100,738,000,040.00 | 36,864.06 | 2,580.48 | 39,444.54 |
| 100738000028A | 16,937.08 | 1,185.68 | 18,122.76 |
| 100738000029A | 18,453.52 | 1,239.08 | 19,692.60 |
| Grand Total | 376,868.16 | 25,374.26 | 402,242.42 |

All equipment not returned on time and may still be active.

C

# EXHIBIT D

| Assets still active Billing 10-1-07 thru 5-31-08 | | | |
|---|---|---|---|
| Contract Number | Qtr Rent Amt | Tax Amt | Total |
| 100738000021 | 514.20 | 36.00 | 550.20 |
| 100738000022 | 469.54 | 32.86 | 502.40 |
| 100738000024 | 210.43 | 10.50 | 220.93 |
| 100738000026 | 8,325.18 | 492.38 | 8,817.56 |
| 100738000030 | 4,728.24 | 331.00 | 5,059.24 |
| 100738000031 | 597.96 | 34.52 | 632.48 |
| 100738000033 | 14,909.39 | 958.04 | 15,867.43 |
| 100738000034 | 2,726.94 | 190.88 | 2,917.82 |
| 100738000035 | 3,875.94 | 271.33 | 4,147.27 |
| 100738000036 | 7,368.51 | 515.76 | 7,884.27 |
| 100738000037 | 8,317.18 | 582.19 | 8,899.37 |
| 100738000039 | 6,154.99 | 430.85 | 6,585.84 |
| 100738000040 | 12,288.02 | 860.16 | 13,148.18 |
| 100738000028A | 4,583.08 | 320.82 | 4,903.90 |
| Grand Total | 75,069.60 | 5,067.29 | 80,136.89 |

Equipment not returned as of 6/11/08.  Will be subject to next quarterly billing

D

## BEFORE THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR NETBANK ALPHARETTA, GA | ) ) ) ) |
| Defendant. | ) ) ) ) |

### VERIFICATION

My name is Steven Kopitskie and I am a Recovery Manager of Hewlett-Packard Financial Services Company ("HPFS").

I have reviewed the attached complaint filed this same day by HPFS and I hereby verify that the factual statements contained therein are correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

June 12, 2008.

_____
STEVEN KOPITSKIE

1467792 v1

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **(IN U.S. PLAINTIFF CASES ONLY)** NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- 1  U.S. Government Plaintiff
- 2 U.S. Government Defendant
- 3  Federal Question (U.S. Government Not a Party)
- 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| **A.** *Antitrust* | **B.** *Personal Injury/ Malpractice* | **C.** *Administrative Agency Review* | **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| 410 Antitrust | 310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product Liability<br>360 Other Personal Injury<br>362 Medical Malpractice<br>365 Product Liability<br>368 Asbestos Product Liability | 151 Medicare Act<br><br>Social Security:<br>861 HIA ((1395ff)<br>862 Black Lung (923)<br>863 DIWC/DIWW (405(g)<br>864 SSID Title XVI<br>865 RSI (405(g)<br>Other Statutes<br>891 Agricultural Acts<br>892 Economic Stabilization Act<br>893 Environmental Matters<br>894 Energy Allocation Act<br>890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| **E.** *General Civil (Other)* | OR | **F.** *Pro Se General Civil* | |
|---|---|---|---|
| **Real Property**<br>210 Land Condemnation<br>220 Foreclosure<br>230 Rent, Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property<br><br>**Personal Property**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | **Bankruptcy**<br>422 Appeal 28 USC 158<br>423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>535 Death Penalty<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br><br>**Property Rights**<br>820 Copyrights<br>830 Patent<br>840 Trademark<br><br>**Federal Tax Suits**<br>870 Taxes (US plaintiff or defendant<br>871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>610 Agriculture<br>620 Other Food &Drug<br>625 Drug Related Seizure of Property 21 USC 881<br>630 Liquor Laws<br>640 RR & Truck<br>650 Airline Regs<br>660 Occupational Safety/Health<br>690 Other<br><br>**Other Statutes**<br>400 State Reapportionment<br>430 Banks & Banking<br>450 Commerce/ICC Rates/etc.<br>460 Deportation | 470 Racketeer Influenced & Corrupt Organizations<br>480 Consumer Credit<br>490 Cable/Satellite TV<br>810 Selective Service<br>850 Securities/Commodities/ Exchange<br>875 Customer Challenge 12 USC 3410<br>900 Appeal of fee determination under equal access to Justice<br>950 Constitutionality of State Statutes<br>890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| **G**. *Habeas Corpus/ 2255* | **H.** *Employment Discrimination* | **I.** *FOIA/PRIVACY ACT* | **J.** *Student Loan* |
|---|---|---|---|
| **530 Habeas Corpus-General** <br> **510 Motion/Vacate Sentence** | **442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)** <br><br> ***(If pro se, select this deck)**\* | **895 Freedom of Information Act** <br> **890 Other Statutory Actions (if Privacy Act)** <br><br> ***(If pro se, select this deck)**\* | **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| **K.** *Labor/ERISA (non-employment)* | **L.** *Other Civil Rights (non-employment)* | **M.** *Contract* | **N.** *Three-Judge Court* |
|---|---|---|---|
| **710 Fair Labor Standards Act** <br> **720 Labor/Mgmt. Relations** <br> **730 Labor/Mgmt. Reporting & Disclosure Act** <br> **740 Labor Railway Act** <br> **790 Other Labor Litigation** <br> **791 Empl. Ret. Inc. Security Act** | **441 Voting (if not Voting Rights Act)** <br> **443 Housing/Accommodations** <br> **444 Welfare** <br> **440 Other Civil Rights** <br> **445 American w/Disabilities-Employment** <br> **446 Americans w/Disabilities-Other** | **110 Insurance** <br> **120 Marine** <br> **130 Miller Act** <br> **140 Negotiable Instrument** <br> **150 Recovery of Overpayment & Enforcement of Judgment** <br> **153 Recovery of Overpayment of Veteran's Benefits** <br> **160 Stockholder's Suits** <br> **190 Other Contracts** <br> **195 Contract Product Liability** <br> **196 Franchise** | **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

| 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from another district (specify) | 6 Multi district Litigation | 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint

**JURY DEMAND:**    **YES**    **NO**

**VIII. RELATED CASE(S) IF ANY**   (See instruction)    **YES**    **NO**    If yes, please complete related case form.

**DATE**    SIGNATURE OF ATTORNEY OF RECORD    /s/ Kevin R. McCarthy

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  Listed below are tips for completing the civil cover sheet.  These tips coincide with the Roman Numerals on the Cover Sheet.

   I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C.,  and 99999 if plaintiff is outside the United States.

   III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

   IV.    CASE ASSIGNMENT AND NATURE OF SUIT:   The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint.  You may select only <u>one</u> category.  You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

   VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

   VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.